*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLUMBIA*

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>)<br>v. )<br>)<br>**CALVIN McCANTS** )<br>) | )<br><br><br>**Criminal Action No. 02-0130 (JGP)** |

### MEMORANDUM OPINION

This matter is before the Court for resentencing following a remand from the Court of

Appeals, which found that this Court had failed to explain its rulings on disputed matters, or

explain why such rulings were unnecessary, in violation of Federal Rule of Criminal Procedure

32(i)(3)(B).  See United States v. McCants, 369 U.S. App. D.C. 138, 139, 434 F.3d 557, 558

(2006).  The parties have been given the opportunity to file post-remand sentencing memoranda,

and appeared before the Court to make their arguments on October 17, 2006.  Upon

consideration of the entire record, the Court hereby reissues the sentence originally handed down

on May 11, 2004, and explains its reasons therefor.

### BACKGROUND

On March 15, 2002, the Government issued a 15-count indictment charging Defendant

with conspiracy to defraud a number of financial institutions and unlawfully transfer various

means of identification in violation of 18 U.S.C. § 371 (Count One), aiding and abetting bank

fraud in violation of 18 U.S.C. § 1344 and 2 (Counts Two through Ten), possession of false

identification documents in violation of 18 U.S.C. § 1028(a)(7) and (a)(3) (Counts Eleven and

Twelve), possession of implements for the production of false identification documents in

1

violation of 18 U.S.C. § 1028(a)(5) (Count 13), access device fraud in violation of 18 U.S.C. §

1029(a)(6)(A) (Count Fourteen); and receipt of stolen goods in violation of 18 U.S.C. § 2315

(Count Fifteen).

On August 19, 2003, Defendant pled guilty to Count Thirteen of the Indictment, pursuant

to a written plea agreement and factual proffer, in exchange for which the Government agreed to

dismiss all other counts at sentencing. See Plea Agreement ¶ 1.  Count Thirteen was based on a

violation of Title 18, Section 1028(a)(5) of the United States Code, which provides for the

punishment of any person who

> knowingly . . . possesses a document-making implement or authentication feature
> with the intent such document-making implement or authentication feature will be
> used in the production of a false identification document or another
> document-making implement or authentication feature which will be so used.

18 U.S.C. § 1028(a)(5) (2002).  According to the indictment, Defendant violated this section in

the following manner:

> On or about December 12, 2000, within the District of Columbia, in a manner
> affecting interstate commerce, defendant CALVIN MCCANTS, knowingly
> possessed document making implements, that is a scanner, laminator device,
> lamination, corn[er] rounder, computer disks containing templates for official
> identifications, including Passports, Military Identifications, Driver's Licenses for
> various States, and Birth Certificates, a computer, a color laser printer, a cutting
> board, and numerous unfinished false Driver[']s Licenses and false Passports,
> with the intent such document-making implements would be used in the
> production of a false identification document.

Indictment at 13.

The written factual proffer provided further specificity on the offense, explaining that the

evidence was the result of searches of four different locations by the U.S. Secret Service and

other law enforcement agencies.  Agents conducted a search of the offices of Mr. McCants'

company, "Custom Computers", located at 2141 P Street N.W., Suite 105, Washington, D.C. on

December 12, 2000.  Statement of the Offense at 1-2.  On December 12 and December 21, 2000,

Agents searched storage bins located at 1420 U Street, N.W., Washington, D.C., and rented by

McCants under the false name of "William Irons" and another individual.  Id. at 2.[1]  Defendant's

home, located at 4306 17th Street, N.W., Washington, D.C., was also searched on December 21,

2000.  Id. at 3.  Finally, on March 25, 2002, a search was conducted of another "Custom

Computers" office space, located at 10 North Calvert Street, Suite 949, Baltimore, Maryland.  Id.

at 3-5.

According to the agreed upon Statement of the Offense, these searches yielded the

following equipment:

-- a scanner;

– at least two laminators and lamination sheets;

– two corner rounders (an item used for cutting corners off cards);

– at least three color printers;

– a cutting board;

– "large iron presses used to emboss seals on official documents for the following

jurisdictions" and agencies: New York City; the New York State Vital Records Office;

Tarrytown, New York (two presses); the District of Columbia; New Jersey; Orange, New

Jersey; Minnesota; and St. Croix, U.S. Virgin Islands; and

– "computers and computer disks containing templates . . . for official identifications such

---

[1]The Statement of the Offense did not indicate who this other individual was.

3

as: passports, military identifications, driver's licenses for various states, [and] birth

certificates."

Statement of the Offense at 1-4. It was also agreed that the searches yielded the following false

identification documents and other cards:

– "more than fifteen driver['']s licenses appearing to be from the District of Columbia,

Maryland, Virginia, and North Carolina and four access devices in some of the same

names as the driver's licenses";

– approximately fifty-nine other identification cards, "including driver's licenses, Social

Security Administration cards, military identification cards, [and] corporate

identifications";

– "unfinished credit cards";

– "more than eleven unfinished driver's licenses from the District of Columbia, one

unfinished military identification card and five unfinished Social Security Administration

cards";

– "approximately [forty-two] blank Maryland Motor Vehicle Administration cards with

the back of the card containing what appeared to be the Motor Vehicle Administration

form with a black magnetic strip";

– "false identification documents for McCants" including "a District of Columbia driver's

license in the name of William Irons but with McCants' photograph", as well as a Social

Security card, 1st Union Bank Mastercard, and health insurance card for William Irons,

"a District of Columbia driver's license in the name of Charles J. Steele but with

McCants' photograph and a Social Security Administration card in the name of Charles J.

Steele"; and

– "on the computer, . . . an electronic copy of the David Murphy identification which was used by another person to obtain a $8,500 loan from Sun Trust Bank."

Statement of the Offense at 2-4.

Also obtained in the searches were "a file marked 'Bank Fraud Issues' containing, among other items, a pamphlet entitled 'A Guide to Avoiding Losses' from the Office of the Comptroller of the Currency and a print-out of an electronic mail from the National Check Fraud Center regarding a data base of intelligence information of bank fraud suspects"; and "Pamphlets entitled 'New ID's in America,' 'How to make driver's licenses and other ID's on your home computer,' and '2000 ID checking guide.'" Id. at 3-4. Finally, the officers found check stock, hundreds of blank credit cards, and "a bag of receipts with customers['] names and addresses from the Adam[']s Mark Hotel in Charlotte, North Carolina." Id. at 1-4.

Ten days after Defendant pled guilty, officers executed a search warrant at Room 101 of the Extended Stay America Suites, located in Columbia, Maryland, where Defendant, who had been released on bond pending sentencing, was found with an extensive array of implements for the production of identification documents and credit cards, as well as credit reports and identification documents. Presentence Investigation Report ("PSR") ¶ 52. Based on this incident, Defendant was subsequently charged in U.S. District Court in Maryland, where he pled guilty and was sentenced to thirty-three months incarceration. Id.

The Probation Office conducted a presentence investigation. Its final Presentence Investigation Report was released on May 6, 2004 after multiple revisions, but still included a number of contested issues. Generally speaking, the parties disagreed upon the amount of loss

which should be attributed to Defendant, and whether Defendant should receive any upward or downward departures.[2]

The specific issues regarding the loss amount included: (1) whether Defendant was responsible for the amount of loss caused by a series of bank frauds perpetrated, in part, by an associate of McCants, Rickey Buchanan; (2) the number of "access devices" which should be counted towards the loss amount and, in particular, whether, as a legal matter, partially blank or obliterated credit cards constituted "access devices"; (3) whether Defendant had sold two access devices to a United States Secret Service Special Agent, Jeffrey Porter, through Mr. Buchanan which should be counted towards the loss amount; and (4) whether Defendant was responsible for the value of defaulted bank loans taken out in the name of "Celvin McCants." The determination of these issues would establish whether the loss attributable to Defendant was more than $120,000 but not more than $200,000, for an offense level increase of ten levels, or more than $200,000 but not more than $400,000, for an offense level increase of twelve levels.

As for departures, the parties disagreed on whether Defendant should receive: (1) an upward departure for the use of "sophisticated means" in the commission or concealment of the offense; (2) an upward departure because the Guidelines significantly understated the seriousness of the offense; (3) a downward departure because the crime was aberrant behavior on his part; (4) a downward departure because of his family ties and responsibilities; or (5) a downward

---

[2]The parties did agree on the following: that the relevant base offense level was six, an additional increase of two levels was necessary because the offense involved more than ten but fewer than fifty victims, another two-level increase was required because the offense involved possession and use of device-making equipment, and that Defendant would receive a two-level decrease for acceptance of responsibility. PSR ¶¶ 5, 8. That Defendant fell into Criminal History Category III was also undisputed.

departure because he was subjected to substandard confinement prior to sentencing.

## DISCUSSION

The Court initially imposed its sentence under the then mandatory United States

Sentencing Guidelines ("Guidelines"). Following the Supreme Court's decision in United States

v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), the Guidelines are advisory. In determining a

sentence after Booker, "a sentencing court is required 'to consider Guidelines ranges' applicable

to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as

well.'" United States v. Coumaris, 365 U.S. App. D.C. 104, 112, 399 F.3d 343, 351 (2005)

(quoting Booker, 543 U.S. at 245-46, 125 S.Ct. at 757). Those "other statutory concerns" are

spelled out in 18 U.S.C. § 3553(a), which instructs judges to consider the following factors, in

addition to the Guidelines and the policy statements of the U.S. Sentencing Commission, in

arriving at a sentence which is "sufficient, but not greater than necessary, to comply with the

purposes set forth in paragraph (2)" below:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
> (2) the need for the sentence imposed --
>> (A) to reflect the seriousness of the offense, to promote respect for the law,
>> and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most effective
>> manner;
> (3) the kinds of sentences available; . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Court notes that the parties have made no arguments based on the

change in the nature of the Guidelines, and that it would reach the same result in sentencing
Defendant under either a mandatory or an advisory regime.

The Court thus begins its analysis with the Guidelines, under which "the sentencing range
for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant
was engaged and not just . . . the conduct underlying the offense of conviction." Witte v. United
States, 515 U.S. 389, 393, 115 S.Ct. 2199, 2203 (1995) (citing U.S.S.G. § 1B1.3); United States
v. Dorcely, 454 F.3d 366, 375 (D.C. Cir. 2006). Relevant conduct includes "all acts and
omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully
caused by the defendant". U.S.S.G. § 1B1.3 (a)(1)(A). Additionally, all harm resulting from
such acts or omissions constitutes relevant conduct. U.S.S.G. § 1B1.3 (a)(3). Facts at sentencing
must be proven by a preponderance of the evidence. The Government bears the burden of proof.
E.g., United States v. Stover, 356 U.S. App. D.C. 175, 187, 329 F.3d 859, 871 (2003); United
States v. Jackson, 333 U.S. App. D.C. 125, 127, 161 F.3d 24, 26 (1988).

## I. Loss Amount

### A. Responsibility for Bank Fraud Scheme Run by Rickey Buchanan

The Court will first address Defendant's responsibility for the bank fraud scheme
perpetrated by Rickey Buchanan and his associates. The Probation Office concluded that

> the defendant and others engaged in a scheme which defrauded banks and lending
> institutions of over $100,000. The scheme involved the creation of fraudulent
> identification documents, to obtain loans and one premium line of credit for a
> fictitious business at various bank branches and other lending institutions in the
> District of Columbia and elsewhere.

PSR ¶ 10. The Probation Office found that Defendant's role in the offense was to provide credit
histories and other personal information on the individuals who would be defrauded, and to

create false identification documents using these victims' information but bearing the likeness of individuals who had been recruited to apply for the loans. Defendant would also create other fraudulent documents necessary to obtain the loans, including pay stubs and income tax statements. Id. ¶¶ 11, 12. The Probation Office stated that Defendant typically received a "one-third payment" from the loan proceeds, either before or after the crime, in return for his efforts. Id. ¶ 13. The Probation Office added that Defendant told another member of the scheme not to use an identification document more than three or four times, as such activity would likely cause the financial institutions to become suspicious. Id. ¶ 14.

Regarding the specific loans, victims, financial institutions, and dates involved in obtaining or attempting to obtain fraudulent loans, the Probation Office provided the following information:

| Date | Individual whose identity was stolen | Financial institution against which fraud was attempted or perpetrated | Amount | Successful? |
|------|--------------------------------------|----------------------------------------------------------------------|--------|-------------|
| 08/03/2000 | Paul S. Cook | SunTrust Bank | $8,500.00 | Y |
| 08/07/2000 | Paul S. Cook | Riggs Bank | $8,000.00 | Y |
| 08/08/2000 | Paul S. Cook | Household Finance | $7,692.08 | Y |
| 01/29/2001 | David Murphy | SunTrust Bank | $8,500.00 | Y |
| 01/29/2001 | David Murphy | BB&T Bank | $8,500.00 | Y |
| 01/29/2001 | David Murphy | Household Finance | $10,000.00 | N |
| 02/28/2001 | Lloyde Cooke | SunTrust Bank | $9,000.00 | Y |
| 03/02/2001 | Lloyde Cooke | Bank of America | $8,900.00 | N |
| 03/09/2001 | Daria A. Rose | SunTrust Bank | $9,000.00 | N |
| 05/22/2001 | Richard Campos | All First Bank | $8,500.00 | N |

9

Id. ¶¶ 15-26, 32. Additionally, the Probation Office found that, on June 8, 2001, an individual had

obtained a line of credit in his own name from Bank of America by misrepresenting his ownership

of and income from a fictitious company, "Jets Transport". That individual proceeded to charge

$23,660.07 against that line. PSR ¶ 22. Based on these attempted and realized frauds, the

Probation Office attributed to Defendant a loss of $110,252.15. Id. ¶ 32.

The Defendant denied any responsibility for this loss. Id. p. 29. Defendant's main

argument was that this was not relevant conduct under the provision which states that relevant

conduct includes "in the case of a jointly undertaken criminal activity (a criminal plan, scheme,

endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged

as a conspiracy), all reasonably forseeable acts and omissions of others in furtherance of the

jointly undertaken criminal activity." U.S.S.G. § 1B1.3 (a)(1)(B). In particular, Defendant argued

that there was no evidence that he was part of a conspiracy with Mr. Buchanan, contending that he

was simply the seller of a product. Def.'s Mot. for Downward Departure and Opp'n Mem.

("Def.'s Mot.") at 5-7; Def.'s Post Remand Mem. in Aid of Sentencing ("Def.'s Post Remand

Mem.") at 4-5. Defendant argues that he never received any portion of Buchanan's bank fraud

proceeds, and neither counseled nor advised Buchanan on how to commit fraud. Def.'s Mot. at 7;

Def.'s Post Remand Mem. at 8-10. Defendant claims never to have "brokered personal

information of credit-worthy victims", asserting that Buchanan had other sources for this sort of

information. Def.'s Mot. at 7-8.

Defendant argues that, with the exception of the David Murphy and Paul Cook loans, the

only evidence the Government has is Mr. Buchanan's testimony, which lacks credibility because

Mr. Buchanan (1) had a long history of independent bank fraud; (2) testified as he did in order to

obtain a "substantial assistance" departure under the Guidelines in his own sentence; and (3) broke the law and violated the terms of his cooperation agreement by committing another bank fraud while supposedly cooperating with the Government. Def.'s Mot. at 6-7, 9; Def.'s Post Remand Mem. at 4-11. Defendant concedes that there is evidence that he supplied Buchanan with false documents relating to Paul Cook and David Murphy. Def.'s Mot. at 9.

Notably, Defendant has primarily argued that he is not responsible for this activity as the "reasonably foreseeable" consequences of "jointly undertaken criminal activity", see U.S.S.G. § 1B1.3 (a)(1)(B), but he has, by and large, failed to argue that this activity is not relevant conduct under the other provision which states that "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" are relevant conduct. See U.S.S.G. § 1B1.3 (a)(1)(A). Under the aiding and abetting provision, "when acquiring the property of another person was the specific objective of the offense, a defendant who aided or abetted that acquisition is to be held responsible for that loss without regard to the foreseeability of his associates' acts." United States v. Maaraki, 328 F.3d 73 (2d Cir. 2003) (holding that stealing calling card numbers and passing them on to associates aided and abetted the subsequent fraudulent use of those numbers and thus defendant is responsible for all loss.)

Upon review of the evidence, the Court finds that the Government has shown by a preponderance of the evidence that Defendant aided and abetted the bank fraud scheme perpetrated by Buchanan in the names of Paul Cook, David Murphy, Richard Campos, Daria Rose, Lloyde Cooke, and Jets Transport. First, regarding the business loan Buchanan obtained in the name of the fictitious "Jets Transport" company, Buchanan testified that McCants gave him forms necessary to obtain this loan. See Sent. Hr'g Tr. 84:2-84:21, Mar. 3, 2004. With respect to

11

victim Paul Cook, a credit report in that name was found in the search of the Washington office of Custom Computers, which concretely links the instances of fraud perpetrated in his name to Defendant. See Ex. p69. Agent Porter's testimony corroborates this. See Sent. Hr'g Tr. 19:15-20:12, Mar. 3, 2004.

As for David Murphy, a driver's license and military identification in his name which were recovered from a bank bear the same image as a license in production on a computer in the Baltimore Custom Computers office. Compare Ex. bk69, with Ex. cal42. Again, Agent Porter's testimony corroborates this. His unrefuted testimony is that the false identification cards were recovered from the bank as an individual by the name of Donald Flexing Anderson used them in attempting to obtain a loan. See Sent. Hr'g Tr. 20:14-22:15, Mar. 3, 2004.[3]

With respect to fraud victim Richard Campos, the images in the military identification and driver's license in his name which were recovered from the bank match images in identification cards Defendant sold to the Government in a controlled buy. Compare Ex. bk70, with Ex. misc1.[4] Agent Porter's statements corroborated this as well. See Sent. Hr'g Tr. 32:13-33:23, Mar. 3, 2004. Agent Porter's unrefuted testimony that the individual portrayed in the identification cards recovered from the bank was also Donald Flexing Anderson. Id. at 22:16-23:7. Buchanan also testified that this was Donald Anderson. Id. at 78:7-78:18. Additionally, the image on the identifications recovered from the bank matches the image on an identification for "Otis Diggs"

---

[3]The Court notes additionally that the Statement of the Offense offered in support of Defendant's plea states that, during the search of the Baltimore Custom Computers office, "[o]n the computer, agents found an electronic copy of the David Murphy identification". Statement of the Offense at 4-5.

[4]See infra at 19-21 for the Court's findings of fact relating to the controlled buy.

found in the Baltimore Custom Computers office. Compare Ex. bk70, with Ex. cal60.

With respect to fraud victim Daria Rose, Agent Porter testified that the person referred to as "Ugmo" by Buchanan and discussed with McCants in a recorded phone conversation, see Call Tr. 2:15-2:24, Oct. 17, 2001, is the unidentified woman who attempted the Daria Rose fraud. See Sent. Hr'g Tr. 29:5-32:7, Mar. 3, 2004. Buchanan also testified to this, and stated additionally that Defendant provided him with a false military identification in the name "Daria Rose". See id. at 79:4-79:23. Defendant has done nothing to controvert the testimony that Ugmo was the "Daria Rose" fraud perpetrator, and the Court therefore credits this testimony. The recorded phone call indicates that Defendant was familiar with this woman, or at least her likeness, but could not locate her photograph to put it on an identification. See Call Tr. 2:15-2:24, Oct. 17, 2001.

For victim Lloyde Cooke, the Government has provided a military identification and a driver's license in this name which was recovered from a bank. See Exs. bk68, bk68a, bk70. Agent Porter testified that these fraudulent identifications were recovered as someone named Mervyn Jackson attempted to use them to obtain a loan. See Sent. Hr'g Tr. 23:10-23:18, Mar. 3, 2004. The Agent also testified that Rickey Buchanan had told him that he obtained these documents from someone he referred to as "Heavy", an individual who turned out to be Mr. McCants. Id. at 23:10-24:20. The Court has examined the fraudulent identifications, and finds that they are identical in type and quality to the other false identifications Defendant created.

In addition to the evidence already discussed, which concretely links Defendant to the bank fraud operation run by Buchanan, the Court notes that Defendant possessed abundant literature which suggests he was reading up on bank fraud, including "Bank Fraud Issues", "A Guide to Avoiding Losses" issued by Office of the Comptroller of the Currency, and information

13

from the National Check Fraud Center regarding a database on bank fraud suspects. See Statement of the Offense at 3-4. Also, the Government submitted a list of names of thirty-two individuals whose credit reports the Government recovered when they searched Defendant's vehicle in Takoma Park. See Ex. tak20; Sent. Hr'g Tr. 16:16-17:21, Mar. 3, 2004. For privacy reasons, the actual reports were not submitted to the Court. See Government's Memorandum in Aid of Sentencing and Motion for Upward Departure ("Gov.'s Mem.") at 9 n.8. The fact that defendant possessed credit reports is further indication that Defendant's criminal conduct extended beyond identification card and access device fraud into the realm of bank fraud.

Likewise, the circumstances of the Takoma Park search are also evidence of Defendant's involvement in bank fraud. The Government states that "[o]n April 23, 2002, law enforcement officers searched McCants' vehicle after they were alerted to a bank fraud in progress in Takoma Park, Maryland. (McCants had been seen driving the suspect to the bank.)" Gov.'s Mem. at 8-9. Agent Jeffrey Porter testified about this search. See Sent. Hr'g Tr. 16:13-16:15, 58:23-61:21, Mar. 3, 2004. Physical evidence from this search has been submitted to the Court,[5] and although nothing else has been submitted which proves the Government's claim regarding the circumstances under which the incident occurred, Defendant only challenged whether Defendant was driving the car, not whether he was in it. Although Defendant's counsel did ask the Agent whether the evidence obtained from this search belonged to Defendant or the other person in the car, Defendant has elsewhere admitted responsibility for this evidence.[6] Moreover, the evidence

---

[5] The Government has labeled all exhibits resulting from this search with the "tak" prefix.

[6] For example, Defendant admitted responsibility for the loss attributable to access devices seized in this search. See Def.'s Mot. at 3.

indicates at a minimum that McCants was in the car with another individual who possessed a false identification card, and who was subsequently charged with an offense stemming from that incident. See Sent. Hr'g Tr. 58:23-61:21, Mar. 3, 2004. All this provides further support for Defendant's involvement with bank fraud.

Additionally, transcripts of phones calls recorded by Agent Porter contain statements by Defendant evidencing his bank fraud activity. For example, on August 23, 2001, Mr. Buchanan and Mr. McCants had a conversation in which Mr. McCants discussed being able to get "complete dossiers" of personal information on individuals with high credit scores. See Call Tr. 5-7, Aug. 23, 2001. On October 17, 2001, after Buchanan asked Defendant whether Defendant's associate, "Doc,"[7] had the false documents he had requested, McCants told Buchanan that Doc would "tell [him] exactly how to use them". See Call Tr. 2-3, Oct. 17, 2001. Later that same day, Buchanan, McCants, and Doc participated in a three-way phone call in which Defendant acknowledged he was working on "bank statements" with Doc. See id. at 18. All this shows that Defendant did more than create false identification cards and access devices: he was providing complete credit backgrounds on individuals, and creating documents necessary to obtain credit from financial institutions.

The Government also offered the testimony of Rickey Buchanan, who pled guilty to the loan fraud at issue here. See Sent. Hr'g Tr. 74:12-74:16, Mar. 3, 2004. Buchanan stated that Defendant was the source of all documents necessary to the bank frauds, see, e.g. id. at 76:3-77:2, 84:3-84:10, and that Defendant gave him some advice as to what to do with these materials, see id., 82:15- 83:17. The Court notes that while Mr. Buchanan has a history of repeated criminal

---

[7]Doc's real name is Jerome Thompson. See Sent. Hr'g Tr. 49:6, Mar. 3, 2004.

activity which diminishes his credibility, his testimony is consistent with the other, abundant

evidence in this case. Based on all of the evidence discussed above, the Court finds that the bank

fraud led by Rickey Buchanan in the names of David Murphy, Paul Cook, Richard Campos, Daria

Rose, Lloyde Cooke, and Jets Transport, are a part of Defendant's relevant conduct, and that he is

thus responsible for a loss of $110,252.15.[8]

## B. Number of Acccess Devices

The Court will next address the number of access devices for which Defendant is

responsible. The Guidelines Commentary provided that "in a case involving any counterfeit

access device or unauthorized access device, loss includes any unauthorized charges made with

the counterfeit . . . or unauthorized access device and shall not be less than $500 per access

device." U.S.S.G. § 2B1.1, cmt. n. (2)(F)(I). Counterfeit and unauthorized access devices are

defined by statute. See U.S.S.G. § 2B1.1, cmt. n. (7)(A)(i). An "access device" is "any card,

plate, code, account number, electronic serial number, mobile identification number, personal

identification number, or other telecommunications service, equipment, or instrument identifier,

or other means of account access that can be used, alone or in conjunction with another access

device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate

a transfer of funds (other than a transfer originated solely by paper instrument)". 18 U.S.C. §

1029(e)(1). A "counterfeit access device" is "any access device that is counterfeit, fictitious,

altered, or forged, or an identifiable component of an access device or a counterfeit access device.

---

[8]Although the Court finds Defendant responsible for the loss attributable to Buchanan's bank fraud, it agrees with the Court of Appeals determination that there is no evidence in the record supporting the statement in the PSR that Defendant typically received one-third of the fraud proceeds. See United States v. McCants, 369 U.S. App. D.C. 138, 144, 434 F.3d 557, 563 (2006) (citing PSR ¶ 13).

16

Id. §1029(e)(2). An "unauthorized access device" is "any access device that is lost, stolen,

expired, revoked, canceled, or obtained with intent to defraud". Id. § 1029 (e)(3).

While both parties agreed on an assessment of $500 loss per access device, they disagreed

on the number of access devices. The Government argued there were 283, see Gov.'s Mem. at 15,

while Defendant took responsibility for 273. See Def.'s Mot. at 3. The Court finds that there

were 283 total access devices, of which three were at least somewhat obliterated[9] and fifteen were

partially blank.[10] This means that 265 access devices were not obliterated or partially blank.[11]

---

[9]By obliterated, the Court is referring to credit cards for which it appears that someone
has attempted to remove the information (name, number, etc.) by shaving, ironing, or some other
means.

[10]By partially blank, the Court is referring to cards which bear the name of a financial
institution and a holographic symbol (Visa, Mastercard, etc.), as well as a magnetic strip, but no
other information (name, number, etc.) In this case, there was no evidence regarding whether the
magnetic strips of such cards were in fact encoded, and the Court will therefore assume they were
not.

[11]The credit cards are examined in more detail as follows:
Defendant asserted that the search of 2141 P Street unveiled sixteen access devices, three
of which were obliterated, but that the Government had claimed twenty-one while only
disclosing nineteen. Def's Mot. at 2-3. In fact, the Government claimed twenty devices from the
search of that location, see Gov.'s Mem., Attach. D at 1, 2 (exhibits from search of that location
indicated with "p"prefix). The Government submitted images of twenty access devices, although
it appears that three of them have been obliterated. See Exs. p52 (one access device), p80 (two
access devices), p81 (six access devices), p82 (six access devices), p83 (five access devices, three
partially obliterated).
Defendant also asserted that a search of the U Street storage units yielded seven access
devices. Def.'s Mot. at 3. The Government claimed eighteen from this search. See Gov.'s
Mem., Attach. D at 2-3 (exhibits from search of that location indicated with "u" prefix). The
Government submitted images of eighteen access devices, although ten of them are partially
blank. See Exs. u31(one access device), u42 (four access devices), u48 (one access device), u50
(one access device), u52 (one access device plus ten partially blank).
Defendant claims that the search of the Baltimore Custom Computers office unveiled 237
hand written names and credit card numbers. Def.'s Mot. at 3. The Government claimed only
234 devices from this search. See Gov.'s Mem., Attach. D at 3-18 (exhibits from search of that
location indicated with "cal" prefix). There are images of at least forty-six credit cards, although

Defendant argued that "it [was] a legal impossibility for the obliterated access devices to be used by Mr. McCants for purposes of fraud, by virtue of the access devices having been destroyed by the obliteration." Def.'s Mot. at 3. Defendant's argument seemed to be that these obliterated devices do not count as "card[s] . . . that can be used" within the meaning of the statute. See Def.'s Mot. at 3 (citing 18 U.S.C. § 1029(e)(1)). Defendant refined its argument post-remand, positing that the plain meaning of the statute is that an access device "must be a means of accessing an account." Defendant argued that the Government had failed to show that the obliterated cards met this requirement, because it had failed to present "any evidence regarding how the obliterated cards could be used in 'conjunction with another access [device]' to obtain money, goods, or services", or "how the obliterated cards could be reconfigured to a degree to conceal that [they] had been physically tampered [with], thereby making it patently obvious to a retailer that the card was not valid." Def.'s Post Remand Mem. at 15 (quoting United States v. Nguyen, 81 F.3d 912 (9th Cir. 1996).

There appears to be a split in the case law which makes it unclear whether obliterated or blank devices count as access devices, and the D.C. Circuit has not ruled. Compare United States

---

five are partially blank. One hundred and eighty-eight additional access devices come in the form of receipts from a hotel with customers' names, addresses, and credit card numbers; the bag of receipts is photographed but the individual information cannot be seen and the devices cannot be individually counted. Gov.'s Mem., Attach. B, Exs. cal27 (five unprinted access devices), cal43 (at least forty-one access devices), cal26 (188 receipts). Thus, the total number of access devices claimed from this search is 234.

Defendant asserted that the search of the vehicle in Takoma Park resulted in the seizure of thirteen credit cards. Def.'s Mot. at 3. The Government claimed only eleven devices from this search. See Gov.'s Mem., Attach. D at 5-6 (exhibits from search of that location indicated with "tak" prefix). The Government provided images of eleven access devices. Exs. tak22 (two access devices), tak23 (seven access devices), tak24 (two access devices). Considering all of these searches, there is evidence of 283 purported access devices, of which three appear to be partially obliterated and fifteen were partially blank.

18

v. Abodid, 257 F.3d 191 (2d Cir. 2001) (holding that validated airline tickets are access devices because they access services of value), with United States v. Nguyen, 81 F.3d 912 (9th Cir. 1996) (holding that completely blank credit cards are access devices, despite lack of evidence that they could be used alone to access account, because they could be used in conjunction with another access device to obtain money, goods, or services). The Court will not resolve this issue, because even if only the undisputed devices are counted, the aggregate loss would still rise above $200,000. Therefore, the Court will assess a loss of $132,500 based on Defendant's undisputed possession of 265 access devices and not rule on the eighteen disputed access devices.

## C. Controlled Buy of Two Access Devices

The third issue the Court will address is whether Defendant sold two access devices to Agent Porter through Rickey Buchanan. Defendant disputes that he sold the access devices, claiming instead that Rickey Buchanan stole the $3000 in registered funds, and that another individual, "Doc", actually provided the access devices. However, the preponderance of the evidence shows that Defendant sold these devices, and they therefore are part of his relevant conduct. Based on that, he is responsible for $1000 in loss.

Agent Porter testified that he requested that Mr. Buchanan ask Defendant to make identification documents using photos Defendant already possessed of Donald Flexing Anderson and "Ugmo". See Sent. Hr'g Tr. 31:20-32:2, Mar. 3, 2004. The evidence shows that Buchanan discussed buying two access devices with McCants on August 23rd, 2001 for $3000, and McCants indicated he was all out of credit cards but would order them. See Call Tr. 3:4-5:14, Aug. 23, 2001. On September 5, 2001, Buchanan arranged to buy access devices from McCants for $3000. See Call Tr. 1:23-2:21, Sept. 5, 2001. Buchanan also asked whether McCants still had

19

images of his "man", his "soldier", "Don". McCants asked if that was the "light-skinned dude".

Buchanan said it was. Id. at 3:12-4:4. Agent Porter has testified that this individual was Donald

Flexing Anderson. See Sent. Hr'g Tr. 22:6-23:5, Mar. 3, 2004.

Agent Porter testified that he gave Buchanan $3000 for this purpose and watched

Buchanan as he went to the place he was supposed to meet McCants, a truck parked near Wilson's

Restaurant on Georgia Avenue in Washington. Although Agent Porter did not see McCants, and

the wire Buchanan was wearing did not function, Buchanan returned without the $3000. See

Sent. Hr'g Tr. 33:24-35:1, Mar. 3, 2004.

On October 17, 2001, McCants indicated that both devices had been produced, and that

Doc had them. Call Tr.1:22-2:19, Oct. 17, 2001. McCants stated that the image of Buchanan's

"boy" had been put on both identifications, rather than just one, because he had not been able to

find the image of the woman known as "Ugmo". Id. at 2:17-2:24. McCants told Buchanan that

Doc would give Buchanan instructions on how to use the cards. Call Tr. 3:15-3:24, Oct. 17, 2001.

McCants also complained about having lost the first set of cards he had for Buchanan, and

indicated that Buchanan would receive the second set that had been made. He also indicated that

the first set had the image of "Ugmo" on them. Id. at 4:15-7:5.

Later, after failing to reach Doc, Buchanan called McCants again. McCants then

conferenced in Doc, and they all discussed when to meet so that Doc could give Buchanan the

cards. Id. at 17:4-23:16. Doc and McCants discussed the first set of cards which had been lost,

referring to the fact that they bore images of "Ugmo" and a man, to whom Doc also referred as

"the light-skinned" guy. Id. at 20:18-21:6. It is undisputed that Defendant subsequently received

the identifications and unauthorized devices from Doc. These are in the names "Jason Pappert"

20

and "Edward Jones". See Ex. misc1; Sent. Hr'g Tr. 35:16-35:24, Mar. 3, 2004.

The devices obtained through this controlled buy can be linked concretely to evidence from locations controlled by McCants. A name and credit card number on one of the access devices purchased correspond with a name and credit card number on a list found in a search of the Baltimore Custom Computers office. Compare Ex. misc1, with Ex. cal43 (using name Jason Pappert and credit card number for Cory Callison); see also Sent. Hr'g Tr. 35:25-37:2, Mar. 3, 2004. Additionally, the image on the purchased identification cards matches an image obtained from the bank in the Richard Campos fraud. Compare Ex. misc1, with Ex. bk70; see also Sent. Tr. 35:25-36:26, Mar. 3, 2004. Agent Porter testified that the individual pictured in these identifications is Donald Flexing Anderson. See Sent. Hr'g Tr. 32:13-33:1, Mar. 3, 2004. The Court is satisfied that the preponderance of the evidence establishes that this controlled buy was part of Defendant's relevant conduct, and will thus hold him liable for $1000 – $500 for each of two unauthorized access devices.

### D. Responsibility for Defaulted "Celvin" McCants Loans

The Government argues that Defendant obtained three loans which he did not repay from Suntrust bank which amounted to a loss of $32,949.57. According to the Government, the loans were issued to a "Celvin McCants" with the address of 8808 Pensacola Place, Upper Marlboro, Maryland, and one of the loans was for the vehicle McCants was driving when searched in Takoma Park. Gov.'s Mem. at 19. The Court of Appeals determined that the Government should have been on notice that these loans were contested, because Defendant did not include the value of them in his calculation of the loss amount. United States v. McCants, 369 U.S. App. D.C. 138, 145, 434 F.3d 557, 564 (2006). However, Defendant did not state prior to remand that these loans

21

were contested, nor argue why their value should not be attributable to him. After the remand, Defendant specifically contested the loans, but only by saying the Government evidence is insufficient. Defendant has offered no theory or argument explaining why he is not responsible for these loans, nor has he submitted evidence. See Def.'s Post Remand Mem. at 13-15.

On the other hand, the Government has submitted physical evidence from multiple searches establishing that Defendant created a false identity for himself as "Celvin" McCants, which ties Defendant to these loans. Notably, there are multiple identification cards in the name of "Celvin" McCants but bearing a photograph of Defendant, including one with the Pensacola Place address mentioned above. See Exs. cal51 (military identification), tak22 (driver's license). Additionally, these searches revealed other identifications in the name of "Celvin" McCants. See Exs. cal51 (Social Security card, health insurance card), tak22 (car insurance card). Moreover, thirteen fraudulent credit cards in this name were also obtained, showing Defendant's willingness to use his false identity for financial gain. See Exs. tak22, tak23, tak24. With nothing to refute this evidence, not even a theory, the Court finds that the preponderance of the evidence shows Defendant's responsibility for $32,949.57 in loss attributable to the "Celvin" McCants loans.

### E. Conclusion

In summary, Defendant is responsible for $110,252.15 in loss for aiding and abetting Rickey Buchanan's bank fraud scheme, $132,500 in loss based on the possession of unauthorized access devices, $1000 in loss for the sale of two access devices to a U.S. Secret Service Agent through Rickey Buchanan, and $32,949.57 in loss for defaulted loans issued to "Celvin McCants". This brings the total loss amount to $276,701.72. Because this loss is more than $200,000 but not more than $400,000, the offense level should be increased twelve levels.

22

## II. Departures

### A. Sophisticated Means Enhancement

The Guidelines provide that "[i]f. . the offense otherwise involved sophisticated means",

the offense level should be increased by two levels. U.S.S.G. §2B1.1(b)(8)(c). Commentary Note

Six clarifies this: "'[S]ophisticated means' means especially complex or especially intricate

offense conduct pertaining to the execution or concealment of an offense.  For example, in a

telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating

soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct

such as hiding assets or transactions . . . through the use of fictitious entities, corporate shells, or

offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. §2B1.1, cmt.

n. 6.

The Government argues that Defendant's crime involved sophisticated means, relying on

the complexity and artistry involved in the process of making multiple types of false documents

and cards, as well as the complexity of McCant's "factories" and  equipment.  See Gov.'s Mem. at

19-21; Gov.'s Further Mem. in Aid of Sentencing Post Remand ("Gov.'s Post Remand Mem.") at

15–17. The Government argues that Defendant's concealment of his operation was sophisticated,

because he operated from different locations, was aided by at least one assistant (Doc), and hid the

operation under the guise of the purportedly legitimate Custom Computers business.  Gov.'s Post

Remand Mem. at 15–16.

Defendant responded that his conduct did not involve sophisticated means, claiming that

there was nothing sophisticated about the manufacture and sale of false documents and cards.

Defendant argues that the statute to which Defendant pled guilty already criminalizes the

possession of document-making implements with the intent that they be used in the production of false documents, and that Defendant should not receive an additional penalty for the possession of such implements. Def.'s Mot. at 10-11. Defendant argued that no expertise was required to use the equipment; that while the equipment may have been sophisticated, all Defendant did was use is as intended by the manufacturers. Def.'s Post Remand Mem. at 15-19.

In this matter, the Court wholeheartedly agrees with the Government. Defendant possessed sophisticated equipment which he used in sophisticated ways. He possessed multiple computers and printers, blank credit cards, embossers, tippers, encoders, card readers, and official or official looking seals. That knowing how to use all these items – individually and in a process to create a product – was a sophisticated skill is evidenced by the many resource materials about how to commit identify theft which he possessed. Moreover, the resources he had on bank fraud were evidence that even knowing which documents to produce to commit such fraud required sophistication.

His operations, used to conceal his possession of his tools and of his activities, were especially complex. He operated out of the offices of two seemingly legitimate businesses, Custom Computers, in both Maryland and the District of Columbia. After his arrest, he operated a complex operation out of a hotel. He kept some of his equipment and false documents in storage spaces which he rented, not in his own name, but in that of William Irons. Thus, simply to rent this space, he had created a false identify, and multiple false identification cards (bearing his likeness) and access devices, using his complex equipment and remarkable expertise. See Exs. u31 (license, social security card, credit card, health insurance card, blank checks), u60 (license), u57 (checks). The Court notes that Defendant had other aliases as well, including

24

Charles Steele and Celvin McCants. See Statement of the Offense at 2-3; Exs. cal51, tak22, tak23, tak24. This amounts to "especially complex [and] intricate offense conduct", done to execute and conceal his offense. Defendant located offices in multiple jurisdictions, and hid his equipment and operations through the use of false identities and seemingly legitimate companies. See U.S.S.G. §2B1.1, cmt. n. 6. Because Defendant used sophisticated means in both the execution and concealment of this offense, he should receive a two-level enhancement.

### B. Upward Departure Because Guidelines Calculation Understates the Seriousness of the Offense

The Government urged the Court to depart upwards because the loss determined under the Guidelines substantially understated the seriousness of the offense. Gov.'s Mem. at 21. The Government initially based this argument on U.S.S.G. §5K2.0, but has since based its argument on the factors found in 18 U.S.C. § 3553(a), including the "need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law[,] to provide just punishment for the offense[,] to afford adequate deterrence to criminal conduct[, and] to protect the public from further crimes of the defendant." See Gov.'s Mem. at 21; Gov.'s Post Remand Mem. at 18-19. Although mindful that "Booker has not changed how the Guidelines range is to be calculated", United States v. Dorcely, 454 F.3d 366, 376 n.6 (D.C. Cir. 2006), the Court notes that U.S.S.G. §5K2.0 (2002) was based on, and quoted from, the very portion of 18 U.S.C. § 3553(b) which was found unconstitutional in United States v. Booker, 543 U.S. 220, 245, 125 S.Ct. 738, 756-67 (2005). Accordingly, out of an abundance of caution, the Court will examine whether departure from the applicable is Guidelines range is warranted by a factor listed in 18 U.S.C. § 3553(a).

Looking at 18 U.S.C. § 3553(a)(2)(A), the Court finds that the Guidelines range does not "reflect the seriousness of the offense". The Court cannot overstate the gravity of the crime committed by Defendant. First of all, the Court notes the extraordinary impact on the victims. The victims' lives were severely disrupted for many months. See Gov.'s Mem., Ex. E. In addition to the time lost attempting to deal with the identify theft, one victim experienced severe marital and familial stress, and his job performance suffered. See Gov.'s Notice of Filing, Feb. 25, 2004. In addition, the Court is aware of five individual victims to Defendant's crime, but the large number of false identifications, credit cards, and credit reports which the government provided suggests that there are in fact many more victims. The Guidelines range fails to consider the inconvenience and other ill effects they may have suffered.

Second, the Court notes that its careful and conservative assessment of the loss amount does not begin to measure the true financial loss. The Government did not seek to include in the loss amount the value of counterfeit checks negotiated by someone purporting to be "Agnes Sun". However, the Government submitted evidence of checks worth $67,800 that it received from banks. See Exs. bk85, bk86, bk87, bk88, bk89. It also submitted video stills of a woman posing as "Agnes Sun" attempting to cash the checks. See Ex. bk90. A false identification in the name "Agnes Sun", and bearing the likeness of someone who greatly resembles the woman in the video stills, was seized in a search of the Baltimore office of Custom Computers. Compare Ex. cal45, with Ex. bk90. While the Government did not argue that this was relevant conduct, had it done so, the Court would have found by a preponderance of the evidence that it was.[12]

_____

[12] The Court note that there is even more evidence of Defendant's links to this fraud: the signature on the fraudulent checks matches an image found in a file on Defendant's computer. Compare Ex. cal44, with Exs. bk85, bk86, bk88. Also, an image of the value of two of the

Likewise, the Government submitted checks received from banks that someone purporting to be "Morton Cohen" negotiated. These were worth $5,127.79. See Exs.bk76, bk77, bk78, bk79, bk80. An image of a "Morton Cohen" identification in progress was found on McCants' computer. See Ex. p87. Video stills show someone attempting to cash the Morton Cohen checks who looks to be the man in that identification. Compare Exs.bk76, bk78, bk79, bk80, with Ex. p87.

Additionally, the man in the partial Morton Cohen identification on McCants' computer appears to be the same man as the one shown on an identification for "Martin G. Allen" on McCants' computer. Compare Ex. p87, with Ex. p88. The Government has submitted a false check worth $1750.28 that an individual purporting to be "Martin G. Allen" attempted to negotiate. See Ex. bk100. Additionally, the Government has submitted a false check worth $1956.88 that an individual posing as "William P. Bailey" attempted to negotiate. See Ex. bk81. This individual appears to be the same man as the one shown on the identifications for "Morton Cohen" and "Martin G. Allen" on Defendant's computer. Compare Ex. bk81, with Exs. p87, p88.[13] Again, if the Government had argued this was relevant conduct, the Court would have found by a preponderance of the evidence that Defendant was responsible for a loss of $8,834.95 based on these incidents.

The Court notes further that searches of locations Defendant controlled yielded counterfeit checks with corresponding identifications in the names "Brian Martin", "Robert B. London",

---

checks ($19,500) was found, in the same font as on the checks themselves, on Defendant's computer. Compare Ex. bk85, with Ex. p86

[13]The Court notes that it does not know whether these bank fraud attempts were successful. See Gov.'s Mem. at 22-23.

"Frank Johnson", and "Greg Taylor". See Exs. p84, p84b. The same man is portrayed in all these identifications. See id. Likewise, false checks and an identification for "Latasha Harper" were found at a location Defendant controlled. See Exs. p50, p52, p85. Finally, additional counterfeit checks were found for "Frances Crawford", "Evelyn Smith", and "Robin Soodeen". See Exs. p78, u63. This evidence indicates the scale of Defendant's operation, the probability that a great deal of loss has not been counted, and the enormous potential for loss Defendant created.

In addition to financial loss, the Court notes that Defendant's operation threatened the very security of society. In the era leading up to and immediately following September 11, 2001, Defendant was producing not only fraudulent credit cards, driver's licenses, and social security cards, but also military identifications. By the Court's count, at least fifteen such identifications were found in locations Defendant controlled. See Exs. p40 (Jason O. Williams), u49 (Cynthia A. Yager, Sandra M. Holman, Scott L. York, Melissa Gaye Napier, Marshae T. Day, Paige H. Crafton), u61 (John Vincent MacMillian, Ishwardat Raghunath, blank), cal51 (Celvin McCants), cal60 (Otis Diggs), cal27 (Jimmie Davis Williams, Jr.), bk69 (David J. Murphy), bk70 (Richard Campos). The risk of misuse of such authentic-looking military documents, especially in Washington, D.C., the seat of the federal government, is severe, and the danger springing therefrom is incalculable.

In summary, because the devastating impact on victims, because the loss calculation seriously understates the actual loss attributable to Defendant, and because of the immeasurable security risk posed by Defendant's actions, the Court finds that a harsher sentence than is provided for in the Guidelines calculation is necessary to "reflect the seriousness of the offense." See 18 U.S.C. § 3553(a). The upward departure of two levels, which the Court previously granted in

sentencing Defendant, adequately serves this goal.

### C.  Additional Arguments for Departure

_____Defendant has argued that he should receive a downward departure because of his family ties and responsibilities, and because he experienced substandard confinement prior to sentencing. Defendant has not shown that his circumstances are extraordinary in the least, and thus no such departure is merited.

Defendant also requested a departure claiming this crime was aberrant behavior on his part.  Nothing could be further from the truth.  That request is denied.

### III.  Conclusion

In summary, the Court's analysis of the Guidelines results in a total offense level of twenty-four, based on a base offense level of six, an offense level increase of two because there were more than ten but fewer than fifty victims, an offense level increase of two because the offense involved possession and use of device-making equipment, an offense level decrease of two for acceptance of responsibility, an offense level increase of twelve for a loss amount between $200,000 and $400,000, a two-level upward departure because of defendant's use of sophisticated means, and a two-level upward departure because the guidelines range seriously understates the offense.  Because Defendant falls in Criminal History Category III, that Sentencing Guidelines range is sixty-three to seventy months.  Defendant is accordingly sentenced to seventy-eight months.

DATE: October 27, 2006          **JOHN GARRETT PENN**
                                                **United States District Judge**